# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| THEODORE CHAPDELAINE, *for the benefit of others similarly situated;* FREDERICK KENNEY, *for the benefit of others similarly situated;* MICHAEL CLINTON, *for the benefit of others similarly situated;* RICHARD MOREAU; and RHODE ISLAND HOMELESS ADVOCACY PROJECT <br>     Plaintiffs, <br><br> v. <br><br> PETER F. NERONHA, *in his official capacity as Attorney General;* and WAYNE T. SALISBURY, *in his official capacity as Acting Director of the Rhode Island Department of Corrections,* <br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 15-450-JJM-LDA |

# MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Before the Court are cross motions for summary judgment on whether a Rhode Island statute that prohibits persons classified as "level 3 sex offenders[1]" from maintaining a residence whose boundary is within 1,000 feet of a school boundary is unconstitutionally vague.  ECF Nos. 81, 84.

---

[1] Level 3 is the highest of three "levels" or "tiers" that categorize persons convicted of various offenses relevant to the statute here.  *See* R.I. Gen. Laws § 11-37.1-12(b).

## I.   BACKGROUND

Because the history of this case is extensive, the Court will sample only some of the relevant events. In 1996, the State of Rhode Island ("State") enacted the Sexual Offender Registration and Community Notification Act ("SORCNA"). R.I. Gen. Laws § 11-37.1-1 *et seq.* SORCNA restricts where persons who are classified as level 3 sex offenders may reside. *Id.* § 11-37.1-10(d). The original version of the statute prohibited persons so classified from residing within 300 feet of a school. *See id.* (1996).[2] In 2015, the Rhode Island General Assembly amended SORCNA to increase this prohibition to residing within 1,000 feet of a school. *See* R.I. Gen. Laws § 11-37.1-10(d) (2015).

The named Plaintiffs brought this action claiming that the Residency Restriction is unconstitutional because it: (1) violates Plaintiffs' Due Process rights under the Fifth and Fourteenth Amendments to the United States Constitution because it is vague (Count I); (2) violates their Substantive Due Process rights because it infringes on their fundamental right to family privacy (Count II); (3) violates their Procedural Due Process rights because it denies them liberty and property interests without due process of law (Count III); and (4) violates their constitutional right against *ex post facto* laws (Count IV). ECF No. 1 at 13-15. Plaintiffs quickly moved for a Temporary Restraining Order ("TRO"), which the Court

---

[2] For consistency, the Court will adopt the parties' term of "Residency Restriction" to refer to this part of the statute. *See* ECF No. 81-1 at 1 & n.1 (noting that Plaintiffs' use of the term "Residency Prohibition" in the pleadings and the new term "Residency Restriction"—which Plaintiffs adopted to stipulate facts—both refer to R.I. Gen. Laws § 11-37.1-10(d)).

granted. ECF No. 2. The Court then granted class certification to Plaintiffs' proposed class. ECF No. 58. The TRO was then converted to a preliminary injunction that has remained in effect. ECF No. 6. In 2020—while this case seemingly had become stale—the General Assembly further amended SORCNA to add language that clarified how the distance between a residence and a school would be calculated and limited the definition of schools to kindergarten through grade twelve. *See* R.I. Gen. Laws § 11-37.1-10(d) (2020).

Under the most recent scheduling order, to efficiently litigate this case, limited discovery proceeded first on the vagueness issue. ECF No. 69. With that discovery now complete, both parties moved for summary judgment. ECF Nos. 81, 84.

## II.   STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure controls in deciding whether a party is entitled to summary judgment. Fed. R. Civ. P. 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* More particularly,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When deciding whether the Court should grant summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's

favor." *Barbour v. Dynamics Rsch. Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). As alluded to, there must first be no genuine issues of material fact. "[M]ere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Thus, the issue must be genuine and material. *See id.* "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party . . . . '[M]aterial' means that the fact is one that might affect the outcome of the suit under the governing law." *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994) (citations omitted) (internal quotation marks omitted).

Additionally, the moving party must be entitled to judgment as a matter of law. The moving party is "entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323 (citations omitted) (internal quotation marks omitted). The Court decides this latter element of the summary judgment standard by evaluating "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 252 (alteration in original) (emphasis in original) (citations omitted) (internal quotation marks omitted).

## III.   DISCUSSION

Plaintiffs contend that the Residency Restriction is void for vagueness both as applied to them and facially.  ECF No. 49 at 18, 20.  In its cross motion for summary judgment, the State first argues that Plaintiffs are not properly situated to mount an as-applied challenge because none of them is affected by the alleged ambiguities. ECF No. 84-1 at 11-13.  The State then argues that, even if Plaintiffs can mount such a challenge, they have failed to demonstrate that the Residency Restriction is vague as applied to them.  *Id.*  The State further argues that Plaintiffs have failed to meet their much heavier burden of showing that the statute is facially vague—an argument that does not turn on whether Plaintiffs specifically are affected by the alleged ambiguities.  *Id.* at 13-16.  The Court first reviews the void for vagueness standard and then addresses these issues in turn.[3]

### A.   Void for Vagueness Standard

For a penal statute to comport with Fifth and Fourteenth Amendment Due Process, it must: (1) "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited;" and (2) it must "define the criminal offense . . . in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted).  Due process requires both "fair notice to the citizenry" and "standards for enforcement by the police, judges, and juries."  *Columbia Natural Res., Inc. v. Tatum*,

---

[3] Because the Court ultimately concludes that the Residency Restriction is void for vagueness as applied to Plaintiffs, it need not reach the much broader question of whether this part of the statute is also facially void for vagueness.

58 F.3d 1101, 1104 (6th Cir. 1995) (citing *Int'l Harvester Co. v. Kentucky*, 234 U.S. 216 (1914); *Collins v. Kentucky*, 234 U.S. 634 (1914)).  Otherwise, the statute is void for vagueness because it violates due process in either of these manners.  *See Kolender*, 461 U.S. at 357.  In other words, an ordinary person is not afforded due process of law if she cannot read a statute and figure out how she should conform her conduct.  *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").  An ordinary person also is not afforded due process of law if a statute's standards are unclear such that it could be enforced arbitrarily against her.  *See, e.g., id.* at 108-09 (footnote omitted) ("A vague law impermissibly delegates basic policy matters to police[ officers], judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.").

### B.    Whether Plaintiffs are Properly Situated to Bring an As-Applied Challenge

Because the parties have stipulated that Plaintiffs have standing to challenge the Residency Restriction on vagueness grounds, the Court will not entertain any standing arguments.  *See* ECF No. 82 at ¶¶ 1, 3-12 ("For purposes of this agreement, defendants do not contest that each [P]laintiff (other than Michael Clinton) and the plaintiff class have standing to raise this challenge.").  This ruling includes any argument that effectively acts as a standing challenge, even if it is not expressly labeled as such.  Still, the State purports to raise a slightly different argument.  *See* ECF No. 84-1 at 11-13.  The State argues that the Residency Restriction is not vague

as applied to Plaintiffs, and thus they cannot bring such a challenge. *Id.* (footnotes omitted) ("Plaintiffs Chapdelaine, Kenny, and Moreau have not presented any evidence that supports their claim that the 2020 Residency Restriction is vague as-applied to them."). The State specifically contends that, because two named Plaintiffs live within 1,000 feet of an unambiguous school boundary, whether the Residency Restriction is vague in other respects is irrelevant to them. ECF No. 92 at 3-4 (quoting, *inter alia*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010)) ("[A] defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"). Additionally, because the other named Plaintiff resided within 1,000 feet of only a daycare's boundary—which the Residency Restriction no longer covers—any vagueness is also irrelevant to him. ECF No. 84 at 12 n.8. While the State correctly points out that none of the potentially ambiguous situations that discovery revealed affects these Plaintiffs' current residences, the inquiry does not end there.[4]

Both parties agree that, but for this Court's injunction, at least two Plaintiffs unambiguously would violate the Residency Restriction. ECF No. 88-1 at 9 (accepting that, "[b]ut for the injunction, each [Plaintiff unambiguously in violation

---

[4] Another curiosity of the State's argument arises because the Court has already certified a class. *See* ECF No. 58 (certifying Plaintiffs' class). If the State is correct, can the class no longer proceed because these named Plaintiffs are improper class representatives? The State does not explicitly argue this point. Nor does it approach the possibility of whether the Court could then substitute other class members as proper representatives. In any event, the Court need not disappear down this rabbit hole because it rejects the State's argument that Plaintiffs are not properly situated to mount an as-applied challenge.

of the Residency Restriction] would be required to move or be prosecuted"). Accordingly, if the State's argument is correct, then those Plaintiffs must move residences to remain in compliance with the statute. But where can they move? Answering this question is exactly where Plaintiffs argue that the alleged statutory vagueness affects them. *Id.* at 10 ("Because the 2020 Residency Restriction will always apply to them, [Plaintiffs] are at continuous risk of prosecution or involuntary relocation . . . ."). And the State does not directly address this argument. Further, evidence in the record from Plaintiffs' mapping expert reinforces this claim. *See* ECF No. 91-1 [hereinafter "Wagner Dec."]. The statutory ambiguities of which Plaintiffs complain are not "mere conjectures." ECF No. 92 at 15. Plaintiffs pose real questions about whether the Residency Restriction prohibits certain conduct in which they must engage. For example, students from The Wheeler School ("Wheeler") use Pembroke Field "for school purposes," even though it is owned by Brown University and is not listed on Wheeler's map. ECF No. 81 at 34 (citing ECF No. 82 at ¶¶ 80-82). Could a class member move and live within 1000 feet of Pembroke Field? Likewise, a sports facility that the City of Cranston owns and makes publicly available remains part of Cranston High School East, which is about 0.37 miles away. *Id.* (citing ECF No. 82 at ¶ 76). Could a class member move and live within 1000 feet of the Cranston sports facility?

If the State's response is that Plaintiffs have not shown that they realistically intend to move to a residence that may be subject to the Residency Restriction, that sure sounds like a standing argument. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560 (1992) (citation omitted) (requiring injury that is "actual or imminent, not 'conjectural' or 'hypothetical'"). In other words, the argument that Plaintiffs here have no concrete plan to move to a specific residence is effectively equivalent to reasoning in *Lujan* that the plaintiffs there had no imminent plans to visit a specific site. *See id.* at 564-65 (reasoning that the lack of plans to visit these sites meant that the injury alleged was not "'actual or imminent'" to plaintiffs). In assessing whether a statute is void as applied to them, Plaintiffs need not retread their ground for standing. And because the State has credibly threated Plaintiffs with criminal prosecution, they need not wait for the State to follow through with its threats to raise their vagueness challenge. *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) (citations omitted) (noting that, even for standing purposes, one need not wait to be arrested and prosecuted). Accordingly, it is unclear what more the State requires out of the named Plaintiffs for them to be properly situated to mount an as-applied challenge. Plaintiffs also have shown affirmatively that the alleged statutory ambiguity affects them.[5]

**C.   Whether SORCNA is Void for Vagueness as Applied to Plaintiffs**

As Plaintiffs accept, a person subject to the Residency Restriction has clear notice that she may not reside within 1,000 feet of a school boundary. ECF No. 81-1

---

[5] In any event, Plaintiffs also have proffered evidence that several identifiable class members do reside more than 1,000 feet from an unambiguous school boundary but less than 1,000 feet from an ambiguous school boundary. ECF No. 88-1 at 13-14 (citing Wagner Dec. at ¶¶ 13-23). Even if the State had successfully disputed this evidence, it would at most present a disputed issue of fact, which would make granting *either* motion for summary judgment inappropriate. *See* Fed. R. Civ. P. 56.

at 6-7. Unlike in other cases, the statute is clear that this 1,000-foot distance should be measured in a straight line from residence boundary to school boundary. *Id.* at 8 (noting that the "Residency Restriction provides that the 1,000-foot distance is to be measured from 'the nearest boundary line' 'to the nearest boundary line'"). That is, the distance should *not* be measured as a person would travel between these places or using a central point on the property. *Contra Doe v. Snyder*, 101 F. Supp. 3d 672, 683 (2015) (ruling on a similar Michigan statute that plaintiffs argued was ambiguous on "whether the 1,000 feet distance should be measured 'point to point' or 'property[ ]line to property line' []or whether it should be measured 'as the crow flies or as people actually travel."").

The real dispute is how to determine where these boundary lines (between which the 1,000 feet must be measured) lie. SORCNA states that this distance "shall be measured from the nearest boundary line of the *real property supporting the residence of the person* to the nearest boundary line of the *real property that supports or upon which there exists a school.*" R.I. Gen. Laws § 11-37.1-10(d) (emphasis added). The key question thus becomes whether the language "real property supporting the residence of the person" and "real property that supports or upon which there exists a school" is sufficiently clear. *Id.* Plaintiffs say it is not clear at all. For example, "[d]oes [a school] include playgrounds or fields or parking lots—even if they are far away? Does it matter if the parking lot is only used by faculty or administration and not students?" ECF No. 81-1 at 32. The Court explores two specific issues with this language. The first issue concerns the clarity of the wording

that relates schools and residences to real property.  The second issue concerns the definitions of residences and schools.  The Court then considers the separate issue of who holds authority to interpret the statute.

### 1. Clarity of the Definitions of a School and a Residence

At the outset, the Court finds that the statutory text itself is puzzling.  The statute defines a "School" as "the buildings and real property of kindergarten, elementary, middle, and secondary institutions, whether public or private." R.I. Gen. Laws § 11-37.1-2(u).  The Residency Restriction compounds the ambiguities by using circular language.  The Residency Restriction specifically requires that a person subject to it cannot live within 1,000 feet of "real property that supports or upon which there exists a school," but a school is "the buildings and real property of kindergarten, elementary, middle, and secondary institutions . . . ." *Id.* §§ 11-37.1-2(u), 11-37.1-10(d).  Are the two the same?  Are they materially different?

Because the statute has not provided any further detail into what constitutes a school, the Court must start with an ordinary definition of the word in considering these examples. *See Martone v. Johnston Sch. Comm.*, 824 A.2d 426, 431 (R.I. 2003) (internal citation omitted) ("When interpreting a statute, [the Court's] ultimate goal is to give effect to the General Assembly's intent.  * * * The best evidence of such intent can be found in the plain language used in the statute.").  As a starting point, one might plausibly define a school as the buildings and real property that the school owns or leases.  But why does the statute not come out and explicitly say that or make some other clearer articulation?  One answer is that perhaps there are other spaces

11

that a school uses, but neither owns nor leases, that the General Assembly intended to include in the definition of a school. And, considering the opposite, what about a building or real property that a school leases irregularly (*e.g.*, once a year for graduation)? Or real property of the school that children do not use (*e.g.*, administrative buildings)? Many reasonably might argue that such a location would not fall within the ordinary definition of a school. The General Assembly appears to have intended for the Residency Restriction to apply to more property than to which a simpler definition of school would lend itself ("real property that supports or upon which there exists a school"). *Id.* § 11-37.1-10(d). Yet determining what other property it intended to cover proves elusive.

Of course, there is always the approach that is attributed to Justice Potter Stewart—which is to say, "I know it when I see it."[6] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (Stewart, J., concurring). In other words, one of ordinary intelligence would know basically what a school is. Any real property that holds buildings that are clearly marked as "ABC" elementary, have classrooms, or maintain something else to that effect are intuitively a school. Still, the problem of where exactly ends the school boundary arises. And the same problem arises with the residence boundary. Which adjacent parcels to the unambiguous parcels also get counted for their potential association with the school (or residence)? This point is exactly why parsing the

---

[6] The full language that precedes the often-abbreviated language that the Court cites even more powerfully favors adopting such an approach here. *See id.* ("I shall not today attempt further to define [the term at issue] . . . and perhaps I could never succeed in intelligibly [creating a definition] . . . .")

language "supports"—*see infra*—becomes crucial.  Further, as illustrated by the parking lot example below,[7] there are cases in which reasonable minds might differ.

To be sure, the Court imagines some definitions that are not vague.  For example, a residence could be bounded by the parcel of real property on which the primary structure rests (i.e., excluding a separate parcel with a shed or other such structure and relying on some sort of ordinary understanding of what a residence is).  This definition also might specify that it includes the entire building for one who resides in a condominium or apartment but excludes separate parking pads, community pools, and the like.  In fact, the Court is inclined to adopt such a reasonable definition as its own interpretation of the term.  But as noted in the next subsection, this definition runs into serious textual issues.  For the term school, the Court has earlier laid out some definitions that would not be vague.  Again, to be sure, the State could stick with its case-by-case approach were all the school boundaries compiled in a publicly available forum.  To make the hypothetical even more straightforward, assume that this resource also allowed one to input her address to see if its boundary fell within 1,000 feet of a school boundary.  Then, all one must do would be to consult this resource.  But such a scheme relies on the State, *ex ante*, developing all school boundaries—at least those with respect to which it could expect compliance.  The whole benefit of the individualized approach thus

---

[7] The later example uses the school context, so consider the residence context here.  If a residence has a separate parking pad associated with it, does the real property with the parking pad constitute a boundary of the residence?  Or, if, for example, one lives in a neighborhood with community amenities, such as a pool, is the boundary of the pool included in the boundary of the residence?

disappears.  Without a definitive list or more concrete definition, it is exactly this lack of cognizable process to determine what constitutes a school boundary that undermines the Residency Restriction's constitutionally required clarity.

### 2.  Clarity of the Relations of Schools and Residences to Real Property

The Residency Restriction runs into yet another curiosity in that there is no apparent distinction between real property that "supports" a school and real property "upon which there exists a school."  R.I. Gen. Laws § 11-37.1-10(d).  Based on the "upon which there exists a school" language, the word "supports" does not have a clear ordinary meaning.  *Id.*  For example, it cannot mean physically supports (in that such real property holds the school buildings).  Such a meaning would seem almost identical with that "upon which there exists a school."  *Id.*  The word "supports" most likely refers to some action like functionally supporting a school.  *Id.*  For example, real property that holds only an athletic field likely may not qualify as that "upon which there exists a school."  *Id.*  But if a school uses that athletic field for many of its sports teams' practices and games, then one might consider that field as part of the school (i.e., that field "supports" a school).  *Id.*  The same would be true of a parcel of real property that contained only a playground on which students played.  Although, the playground example is a much more intuitive case than the field example (because of the age of the persons who are likely to use each), given that many public-school fields are open to the broader public.  Again, the same could be true of a parking lot.  But the parking lot example makes the least sense if faculty and staff of the school (i.e., not the students) only used that lot.  There is no evidence

that the General Assembly intended the Residency Restriction to protect non-student adults. *See Martone*, 824 A.2d at 431 (explaining that statutory construction ultimately requires the Court to implement the General Assembly's intent).

Aside from the fact that the Court must engage in a healthy amount of statutory construction to reach these results, there is an even greater textual issue with the verb "support." The first part of the same sentence that the Court just considered refers to "the real property *supporting* the residence of the person." R.I. Gen. Laws § 11-37.1-10(d) (emphasis added). One could read such language to say that the Residency Restriction applies *only* if the real property *only supports* the residence, and not where the real property is that upon which a residence exists. After all, why would the General Assembly have used the same word in the same sentence only for it to have significantly different meanings?[8] But such a reading would be absurd given the statute's objectives of distancing where certain persons reside from schools. And canons of statutory construction counsel against absurd readings of statutes. *See, e.g., Rathbun v. Autozone, Inc.*, 361 F.3d 62, 70 (1st Cir. 2004) (alteration in original) (citation omitted) (internal quotation marks omitted) ("[W]hen apparently inconsistent statutory provisions are questioned, every attempt should be made to construe and apply them so as to avoid the inconsistency and [the

---

[8] The Court later addresses the answer to this question that the phrase "upon which there exists a school" is surplusage given the "supports" phrase. Suffice it to say that there is no reading of the statute that does not run into some legal or textual quandary.

words] should not be applied literally if to do so would produce patently absurd or unreasonable results.").

Given this linguistic jumble, if one is prosecuted for violating the Residency Restriction because she could not parse the ambiguous scope of a statute—or more troublingly, could not foresee the State's construction of an ambiguous statute—that is the exact infirmity that constitutional due process prohibits. *See United States v. Williams*, 553 U.S. 285, 304 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

### 3. Authority to Provide Guidance on the Statute

At this point, one might believe that the inquiry should conclude. SORCNA contains *no* provision that delegates to the Attorney General, an agency, or any other State actor authority to promulgate guidance on the Residency Restriction or otherwise interpret the statute. *See* R.I. Gen. Laws § 11-37.1-1 *et seq.* Accordingly, even were the Attorney General able to articulate a standard that is not vague, it is unclear that his office would have the authority to do so. In other words, it is unclear that the Court could accept the Attorney General's standard as binding under Rhode Island law. Plaintiffs stress this argument in their papers as a reason for the Court to refrain from further attempts to salvage the statute. ECF No. 81-1 at 8.

Nevertheless, statutory interpretation and construction are tasks with which the law regularly charges courts. And parties to a case regularly make arguments

that can inform the best reading of statutory language.  Courts need not ignore these potentially helpful prods because the prodding party is not delegated authority over the statute at issue.  The real concern seems to be that the interpretations and constructions suggested here have insufficient grounding in the text.  Put differently, were the Attorney General to have authority to promulgate guidance on this statute, his reading of it would require more scrutiny given such legal authority.  *See, e.g., Pawtucket Power Assocs. Ltd. P'ship v. City of Pawtucket*, 622 A.2d 452, 456-57 (citations omitted) ("[D]eference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency.").  Nevertheless, the Court considers the plausibility of the State's reading of the Residency Restriction without such deference.

### D.    The State's Responses to Plaintiffs' As-Applied Vagueness Argument

The State, in essence, presents three responses in defense of the Residency Restriction.  *First*, the State argues for its own reading of the Residency Restriction, which it claims is not vague.  *See* ECF No. 84-1 at 18-19.  *Second*, the State argues that severing the Residency Restriction's ambiguities would preserve its core protections as the General Assembly intended them. Tr. of Oral Arg.  *Third*, the State argues that the scienter element required to prosecute one for violating the Residency Restriction mitigates any vagueness.  *Id.*  The Court considers each argument in turn.

### 1.  The State's Reading of the Residency Restriction

While the simplified examples from the first section serve as helpful initial illustrations, the Court recognizes that there might be plenty of articulable standards

that are not unconstitutionally vague. The State presents its own such attempt at articulating such a standard. To begin, the Court cannot ignore the fact that the State itself has had trouble in defining these terms. In fact, it has defined relevant terms at least three ways during the litigation. *See* ECF No. 81-1 at 8-19 (laying out these differing positions). No matter what caused the shifting definitions in discovery, Plaintiffs' confusion on the State's position is understandable. *See id.* (explaining this confusion). The greater point, however, seems to be that, if the State has had difficulties in properly working out these definitions, then those difficulties themselves support the idea that the statute is unconstitutionally vague. Such difficulties would prove far greater to an ordinary person. After all, if the State's process involved law enforcement, school officials, and attorneys collaborating to make precise individualized determinations on these boundaries, how could an ordinary person ever be expected to faithfully follow this process, let alone come to the same conclusion about where these boundaries lie? Not to mention that these difficulties facilitate arbitrary and inconsistent enforcement. *See Williams*, 553 U.S. at 304 (finding relevant considerations of both an ordinary person's understanding and consistent application by law enforcement).

The State suggests that real property—even if not contiguous with real property that is unambiguously a school—should be considered a school if it is "typically used by students for school purposes." ECF No. 92 at 6 (internal quotation marks omitted). According to the State, this determination of whether real property is "typically used by students for school purposes" is made case by case. *Id.* at 6, 8.

18

While neither party could direct the Court to First Circuit case law that is on point, Plaintiffs highlighted that this definition would fail in at least one other circuit.[9] *See Doe v. Cooper*, 842 F.3d 833, 842-44 (4th Cir. 2016) (holding that language in a parallel North Carolina statute, which chose the word "regularly," was unconstitutionally vague). In *Doe v. Cooper*, the North Carolina statute "provide[d] that it shall be unlawful for any registered offender [convicted under certain circumstances] . . . to 'knowingly be' at any of the following locations . . . ." *Doe v. Cooper* at 838 (footnote omitted). Relevantly, restricted locations included "any place where minors gather for *regularly* scheduled educational, recreational, or social programs." *Id.* [hereinafter "subsection (a)(3)"] (emphasis added) (citation omitted). The United States Court of Appeals for the Fourth Circuit approved of language from the district court that "succinctly explained the[] deficiencies" with this statute:

> The first problem stems from the language "regularly scheduled." The term "regular" means happening at fixed intervals[, periodic]. Even if a restricted sex offender or law enforcement officer knew precisely how often and where the "scheduled programs" took place, the statute provides no principled standard at all for determining whether such programs are "regularly scheduled."
>
> Notably, subsection (a)(3) provides no examples to guide restricted sex offenders or law enforcement as to how frequently the programs would need to occur in order to be "regularly scheduled." In contrast, subsection (a)(1) provides examples of (a)(1) "places" and subsection (a)(2) provides examples of (a)(2) "premises" upon which a "location" or "place" might be. This case is distinguishable from other cases holding restrictions that included the word "regularly" or variants of "frequently" to be not vague because those restrictions included examples to clarify which locations were restricted.

---

[9] Plaintiffs also spent much time discussing opinions from various other courts. But because these opinions mostly deal with other issues or make for inapt comparisons, the Court does not discuss them.

*Id.* at 843 (alteration in original) (citation omitted).

While that case is not binding on the Court, its logic is quite persuasive. The Rhode Island Residency Restriction does not specify how often students must use real property before it constitutes a school. Nor does it provide any examples to help with this determination. And the State does not even provide examples beyond its discovery responses.[10] Further, because the State's examples do not appear in any public forum the way a statute would (or the way authorized agencies sometimes provide guidance on their websites), they become both legally and practically less relevant. The State, nonetheless, counters that the Fourth Circuit did not hold unconstitutional the corresponding North Carolina Residency Restriction. ECF No. 92 at 16-17. The North Carolina statute states that "a registered sex offender may not 'knowingly reside within 1,000 feet of the property on which any public or nonpublic school or child care center is located.'" *Doe v. Cooper*, 842 F.3d at 838 (quoting N.C. Gen. Stat. § 14-208.16(a)). But there are two distinct consequences of this position that require separation.

First, even if the Fourth Circuit thought that the North Carolina Residency Restriction was constitutional, it thought that the "gather for regularly scheduled" language was unconstitutional. *See Doe v. Cooper*, 842 F.3d at 842-44 (quoting N.C.

---

[10] Here, it becomes exceedingly clear why the State's changing responses (again, assigning no blame to the State and recognizing the difficulty of the jobs of its employees) are problematic for its position. If the determination is so case specific that relevant parties might change their mind on learning bits of new information, such a determination is not an example that an ordinary person could expect to take as instructive.

Gen. Stat § 14-208.18(a)(3)). Because the State is trying to incorporate the "typically used" language into the Rhode Island Residency Restriction, *Doe v. Cooper*'s discussion of the "regularly" language would apply. *See* ECF No. 84-1 at 18-19 (arguing for similar language to what the Fourth Circuit held unconstitutional in *Doe v. Cooper*, 842 F.3d at 838). And presumably had the North Carolina Residency Restriction also used such language as "typically" or "regularly," the Fourth Circuit also would have explicitly held that subsection unconstitutional. Second—and following from the first point—the State must abandon its "typically used" rule to coherently argue that the North Carolina and Rhode Island Residency Restrictions read similarly. Even so, the Fourth Circuit did not explicitly rule on the North Carolina Residency Restriction. *See Doe v. Cooper*, 842 F.3d 833. It would thus be unfair to attempt to divine anything about the North Carolina Residency Restriction's constitutionality from that opinion. Accordingly, the Court finds that construing the definition of a school to be real property that is "typically used by students for school purposes" would be unconstitutionally vague. ECF No. 84-1 at 6.

### 2. Invoking the Severability Clause

In another attempt to square this circular statute, the State at oral argument raised the possibility of invoking the statute's severability clause. Tr. of Oral Arg. The Court could sever the "upon which there exists a school" language and adopt a broader definition of "support" as to both schools and residence. R.I. Gen. Laws § 11-37.1-10(d). An ordinary definition of a residence that the Court was inclined to adopt above would thus return to viability. Likewise, an ordinary definition of a school

could follow.  But this approach requires that "supports" and "upon which there exists" be surplusage as to a school.  *Id.*  The Court declines to adopt a strained reading of the text to justify severing some of that text that proves inconvenient.

Alternatively, the Court could sever the "supports" language from the definition of a school.  Doing so would make the language read quite similarly to that of the North Carolina Residency Restriction, which sounds reasonable on its face. This new language would also seem to enable one to employ an ordinary definition of a school.  But this new language would likely not encompass other parcels, such as incontiguous fields, that the State would prefer to keep in the definition of a school. More troublingly though, severing the "supports" language as to a school would still leave the "supporting" language as to a residence.  *See id.*  Why would the Court sever language in one instance and not the other?  After all, if the language requires severance, an issue with it must exist.  The only possible explanation is that "supporting" in the context of a school is unconstitutionally vague language, but "supports" in the context of a residence is sufficiently clear.  But is the school context so different from the residence context such that the verb "support" carries two significantly different meanings?  The Court remains unwilling to answer this question in the affirmative. Answering so would require the Court to treat the same verb differently in each of two cases, despite their glaring proximity and with no identifiable reason for doing so.  Again, this approach requires the Court to adopt a strained reading of the text to justify severance of some of that text that proves inconvenient.  The Court declines to rewrite the statute in either manner.

### 3. The Lack of Scienter Defense to a Criminal Prosecution

Finally, the State at oral argument raised that a person who is prosecuted for violating the Residency Restriction despite residing in a zone of ambiguity would be protected by a lack of scienter defense. Tr. of Oral Arg. The State contends that, when it is ambiguous whether one subject to the Residency Restriction resides within 1,000 feet of a school boundary, that defendant could not be legally convicted because she lacked the knowledge that she resided within 1,000 feet of a school boundary. *Id.* This approach presents compelling on its face. But the resulting scheme proves unworkable. Under this theory, the State would first filter which persons as to whom it believed that it could establish scienter in a prosecution for violating the Residency Restriction. The State would then try each person, and the jury—or perhaps the judge in rare cases—would ultimately find that the person knew or did not know that she was violating the Residency Restriction.

In just describing a simplified version of such a scheme, one can see that inconsistent enforcement would likely exist. Who has the knowledge that she is violating the Residency Restriction would turn on individual decisions by various individual prosecutors, judges, and jurors—subject, of course, to the rules of criminal procedure, evidence, and the like. *See also Williams*, 553 U.S. at 304 ("A conviction fails to comport with due process if the statute under which it is obtained . . . is so standardless that it authorizes or encourages seriously discriminatory enforcement."). Even so, if persons are tried but acquitted, they still would have been put through the ordeal of a criminal prosecution. Such a specter would almost

certainly lead persons subject to the Residency Restriction to err on the side of caution.

While perhaps related, the standard of constitutional clarity cannot rest on the criminal standard of scienter.  With any statute, there are undoubtedly close cases in which one might be uncertain whether the conduct in which she wishes to engage is proscribed.  And presumably with these many criminal statutes that present close cases, defendants are acquitted because they lacked scienter.  Yet, at the same time, presumably many of those criminal statutes lack scienter as an element of the offense.  Accordingly, the proposition that the scienter element can save a statute's constitutionality does not logically follow.

## IV.   CONCLUSION

Because neither an ordinary person nor law enforcement could understand the statutory language that attempts to define the boundaries of residences and schools, the Residency Restriction must be declared unconstitutional as void for vagueness. For these reasons, the Court GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment.  ECF Nos. 81, 84.  Final Judgment will enter for Plaintiffs.

IT IS SO ORDERED.

_____

John J. McConnell, Jr.
Chief United States District Judge


March 16, 2023